TO BE PUBLISHED IN THE OFFICIAL REPORTS

OFFICE OF THE ATTORNEY GENERAL
State of California

DANIEL E. LUNGREN
Attorney General

_____

| | | |
|---|---|---|
| OPINION | : | |
| | : | No. 95-411 |
| of | : | |
| | : | December 29, 1995 |
| DANIEL E. LUNGREN | : | |
| Attorney General | : | |
| | : | |
| ANTHONY S. Da VIGO | : | |
| Deputy Attorney General | : | |
| | : | |

_____

THE HONORABLE FRED AGUIAR, MEMBER OF THE CALIFORNIA STATE ASSEMBLY, has requested an opinion on the following questions:

1. May an individual simultaneously serve as a San Bernardino County Sheriff's Deputy Chief and Yucaipa City Councilman?

2. If so, may the city council enter into a contract with the sheriff to provide law enforcement services to the city?

3. If so, may the deputy chief who is a city councilman be assigned to perform law enforcement duties within the city?

CONCLUSIONS

1. An individual may simultaneously serve as a San Bernardino County Sheriff's Deputy Chief and Yucaipa City Councilman.

2. Where a sheriff's deputy chief is a city councilman, the city council may be able to enter into a contract with the sheriff to provide law enforcement services to the city.

3. A sheriff's deputy chief who is a city councilman may be assigned to perform law enforcement duties within the city.

ANALYSIS

The three questions presented for resolution concern a San Bernardino County Sheriff's Deputy Chief who is seeking election to the Yucaipa City Council. May he do so without forfeiting his position as a deputy chief? If so, may the city continue to contract with the sheriff for law enforcement services, and if so, may the deputy chief continue to perform such services?

1. The Incompatible Offices Doctrine

The first inquiry concerns the application of the common law doctrine of "incompatible offices."[1] The doctrine prohibits a person from holding simultaneously two public offices if the performance of the duties of either could have an adverse effect on the other. (*People ex rel. Chapman* v. *Rapsey* (1940) 16 Cal.2d 636, 641-642; 76 Ops.Cal.Atty.Gen. 81, 82-83 (1993).) If the two positions are offices, and if they are incompatible, the acceptance of the second office automatically terminates the holding of the first. (*People ex rel. Chapman* v. *Rapsey, supra*, 16 Cal.2d at 644; 76 Ops.Cal.Atty.Gen., *supra*, at 83.) Significantly, if one of the positions is an "employment" as distinguished from an "office," the doctrine does not apply. (74 Ops.Cal.Atty.Gen. 82, 83 (1991); 73 Ops.Cal.Atty.Gen. 183, 184 (1990).)

We have previously determined that a member of a city council holds a public office for purposes of the incompatible offices doctrine. (75 Ops.Cal.Atty.Gen. 10, 13 (1992); 74 Ops.Cal.Atty.Gen., *supra,* at 83-86; 73 Ops.Cal.Atty.Gen. 354, 356 (1990).) Whether the same is true of a sheriff's deputy chief is not so easily answered. In 68 Ops.Cal.Atty.Gen. 7, 8 (1985), we stated that a deputy sheriff holds a public office for purposes of the doctrine:

". . . A deputy sheriff also holds a public office, both in his capacity as a deputy to a county officer and as a peace officer. (See Gov. Code, §§ 24000, subd. (b), 24100-24104, 7, 1194; *People* v. *Woods* (1970) 7 Cal.App.3d 382, 387 (deputy sheriff has `all powers possessed by the sheriff'); *Neigel* v. *Superior Court* (1977) 72 Cal.App.3d 373, 378, and cases cited, (policeman held to be public officer).)"

Our 1985 conclusion requires reexamination in light of recent court decisions and opinions of this office.

In *Dibb* v. *County of San Diego* (1994) 8 Cal.4th 1200, the Supreme Court construed the term "county officers" for purposes of section 4(e) of article XI of the Constitution (county charters shall provide for the "powers and duties of governing bodies and all other county officers . . . ."). It stated:

---

[1]"The common law of England, so far as it is not repugnant to or inconsistent with the Constitution of the United States, or the Constitution or laws of this State, is the rule of decision in all courts of this State." (Civ. Code, § 22.2.)

"`A public office is ordinarily and generally defined to be the right, authority, and duty, created and conferred by law, the tenure of which is not transient, occasional, or incidental, by which for a given period an individual is invested with power to perform a *public function* for the benefit of the public. [Citation.] . . . . The most general characteristic of a public officer, which distinguishes him from a mere employee, is that *a public duty is delegated and entrusted to him, as agent, the performance of which is an exercise of a part of the governmental functions of the particular political unit for which he, as agent, is acting. . . .* [Citations.] As a matter of course, in keeping with these definitions, a county office is a public officer and may be specifically defined to be one who fills a position usually provided for in the organization of counties and county governments and is selected by the political subdivision of the state called the "county" to represent that governmental unit, continuously and as part of the regular and permanent administration of public power, in carrying out certain acts with the performance of which it is charged in behalf of the public. [Citations.]' (*Coulter* v. *Pool*, *supra*, 187 Cal. at pp. 186-187, italics added and deleted.)

". . . [I]n *Sprekels* v. *Graham* (1924) 194 Cal. 516 we reaffirmed our holding in *Coulter* v. *Pool*, *supra*, 187 Cal. 181. In doing so, we explained that `two elements now seem to be almost universally regarded as essential' to a determination of whether one is a `public officer': `First, a tenure of office "which is not transient, occasional of incidental," but is of such a nature that the office itself is an entity in which incumbents succeed one another . . . , and, second, the *delegation to the officer of some portion of the sovereign functions of government,* either legislative, executive, or judicial.' (*Sprekels* v. *Graham*, *supra*, 194 Cal. at p. 530, italics added.)

"It seems clear that the italicized phrase quoted above from *Sprekels* v. *Graham*, *supra*, 194 Cal. at page 530, and repeated in *City Council* v. *McKinley*, *supra*, 80 Cal.App.3d at page 210, is in fact, and was intended to be, consistent with the similar language employed in our leading case on the issue, *Coulter* v. *Pool*, *supra*, 187 Cal. at page 187. In other words, a public officer (or a county officer) is one who, inter alia, is delegated a public duty to exercise *a part of the governmental functions* of the political unit for which he, as agent, is acting. . . ." (*Id*., at p. 1212.)

We have no doubt that a sheriff's deputy chief may be considered an "officer" for some purposes. (See 76 Ops.Cal.Atty.Gen. 157, 161 (1993); 63 Ops.Cal.Atty.Gen. 710, *supra*.) However, holding public office for purposes of the incompatible offices doctrine requires further analysis as set forth in *Neigel* v. *Superior Court* (1977) 72 Cal.App.3d 373. In *Neigel*, the court examined the incompatible offices doctrine as incorporated into a city's charter. The court concluded that even though policemen perform "sovereign governmental powers" and are "public officers" for some purposes, they were not officers for purposes of the city's incompatible offices charter provision. The court explained:

"The city relies on cases holding that a policeman falls within the category of a public officer because he is entrusted with the duty and power to exercise a part of the

sovereign governmental powers of the entity for which he is acting. [Citations.] However, the fact that policemen have been held to be public officers for certain purposes does not lead inevitably to the conclusion that they are `officers' for all purposes. [Citation.] The meaning of the words `officer' or `official' varies with the conditions and circumstances in which they are used. [Citations.]

"Section 225 provides that no `person holding a salaried office of this City, whether by election or appointment,' shall hold any other governmental office described and declares that any such person who, `during his term of such office,' shall accept such other governmental office `shall be deemed thereby to have vacated the office held by him under this City Government, and the same shall immediately become vacant.' Although the charter does not define the word `office,' it does provide for various elective and appointive officers such as mayor, councilmen, city attorney, city assessor, treasurer, city engineer, superintendent of streets, chief of police, chief engineer of the fire department, and members of various boards and commissions established by the charter. Those persons occupy policy-making positions; they are elected or appointed for either a prescribed term or serve at the pleasure of the appointing authority; and their duties and powers are prescribed by the charter. Section 225 was manifestly intended to apply to such persons.

"Policemen, however, are employed pursuant to open competitive civil service examinations and are referred to in the charter as classified employees. They do not serve either for a definite `term' or at the pleasure of the appointing authority; their duties are not prescribed by the charter; nor are they clothed with policy-making authority. In these circumstances, we do not deem a policeman to be a `person holding a salaried office of this City' in the context of section 225.

"Section 225 expresses the common law principle that acceptance by a public officer of another office which is incompatible with the first automatically vacates the first office. [Citations.] By prescribing that acceptance of any other defined governmental office will result in automatic vacation of a city office, the section avoids the problem of determining incompatibility on a case by case method. The doctrine of incompatibility, however, remains a relevant consideration in determining whether the section was intended to apply to a policeman. The doctrine rests on the rationale that public policy demands that an office holder discharge his duties with undivided loyalty and that two offices cannot be held by one person where, from the potential antagonistic character of the offices, the public interest may suffer. [Citation.] We see nothing in the nature of the duties and powers of a policeman which would be inherently inconsistent or incompatible with the duties of a school board member. [Citation.]" (*Id*., at pp. 378-379, fn. omitted.)

As indicated in *Neigel*, an important factor to consider in applying the incompatible offices doctrine is whether both positions require the exercise of policy-making authority that would produce divided loyalties.

Here we find that the individual in question is one of six deputy chiefs serving under two assistant sheriffs, who in turn are accountable to the undersheriff, who answers directly to the sheriff. The duty specifications for a deputy chief require him to manage a major operational segment or bureau within the sheriff's department. The position of deputy chief is filled by an open competitive civil service examination.

The position of sheriff's deputy chief is not described by statute or ordinance as constituting a public office. Subdivision (b) of section 24000 lists the sheriff as being a county "officer"; no other position in the sheriff's department is so listed. Those serving below the sheriff are described in section 24105 as having "positions" rather than "offices":

"If the office of any of the county officers enumerated in Section 24000 of this code is vacant, the duties of such office may be temporarily discharged by a chief deputy, assistant or deputy of such officer, as the case may be, next in authority to such county officer in office at the time the vacancy occurs, with like authority and subject to the same obligations and penalties as such county officer, until the vacancy in the office is filled in the manner provided by law; provided that *if the vacancy occurs in the office of sheriff, the duties of such office shall be discharged by the undersheriff, or if that position is vacant, by the assistant sheriff, or if that position is also vacant, by the chief deputy next in line of authority*." (Italics added.)

The duties and powers of a sheriff's deputy chief are not specified by statute, charter, or ordinance. A deputy chief, while performing sovereign duties as in *Neigel*, does not hold a policy-making position. Rather, he has an administrative position which could be eliminated by internal reorganization. Thus the position does not appear to meet the criterion of "an office which is not transient, occasional or incidental but is in itself an entity in which incumbents succeed one another." (*Moore* v. *Parrish* (1982) 32 Cal.3d 535, 536; see *Cerini* v. *City of Cloverdale* (1987) 191 Cal.App.3d 1471, 1478; *City Council of San Diego* v. *McKinley* (1978) 80 Cal.App.3d 204, 210.)

Besides *Neigel*, the case that appears most similar to the present situation is *Shaeffer* v. *Superior Court* (1952) 113 Cal.App.2d 428. In *Shaeffer*, the court considered whether the manager of the Santa Barbara district audit office of the Department of Employment came under the terms of Penal Code section 1203 as a "public official." The position was four steps removed from the director of the department, and the "duties consisted principally of routine investigations, audits, reports, ordinary clerical work, and making recommendations to the supervising and central offices." (*Id*., at p. 435.) The court concluded that such administrative duties were insufficient to support a finding that the position was a public office. (*Id*., at p. 437.)

Finally, we note that at common law, a "deputy" was authorized to perform only limited, ministerial duties on behalf of his principal. (52 Ops.Cal.Atty.Gen. 75, 76-78 (1969).) The Legislature changed this rule by statute, generally allowing a deputy to perform any of the duties of his principal unless otherwise prohibited. (*Ibid*.; see Gov. Code, §§ 7, 1194, 24100.)[2] Currently, then, a

---

[2]Unidentified section references hereafter are to the Government Code.

deputy may perform any of the duties of his principal unless restricted by statute, charter, ordinance, regulation, or by the principal. (See 70 Ops.Cal.Atty.Gen. 250, 253, fn. 6 (1987); 63 Ops.Cal.Atty.Gen. 710, 715, 718-719 (1980); 31 Ops.Cal.Atty.Gen. 121, 124-126 (1958); see also 73 Ops.Cal.Atty.Gen. 357, 360-361 (1990); 66 Ops.Cal.Atty.Gen. 293, 295-302 (1983).) Based upon *Neigel* and *Shaeffer*, however, we do not believe that a sheriff's deputy chief holds an office for purposes of the incompatible offices doctrine merely because he is a deputy. Numerous other indicia, as described above, support the conclusion that he holds a county "position" as the "manager" of a sheriff's bureau for purposes of the common law rule prohibiting persons from holding simultaneously two incompatible offices.

Accordingly, the position of sheriff's deputy chief in San Bernardino County is not a public office to which the common law doctrine attaches. (See 74 Ops.Cal.Atty. Gen., *supra*, at 83-85 [fire division chief]; 68 Ops.Cal.Atty.Gen., 337, 346-347 (1985) [fire captain II]; 56 Ops.Cal.Atty.Gen. 556, 559-563 (1973) [assistant superintendent of public instruction]; 46 Ops.Cal.Atty.Gen. 74, 85-86 (1965) [community services district engineer]; 40 Ops.Cal.Atty.Gen. 238, 239-240 (1962) [manager of district agricultural association]; 19 Ops.Cal.Atty.Gen. 119, 126-127 (1952) [manager of joint powers agency water project].) It is concluded that an individual may simultaneously serve as a San Bernardino Sheriff's Deputy Chief and Yucaipa City Councilman.[3]

2.  Contracting For Law Enforcement Services

The second inquiry concerns the ability of a city council to continue to contract with the sheriff for law enforcement services, where one of the council members is employed as a sheriff's deputy chief. Section 1090 provides in part that ". . . city officers or employees shall not be financially interested in any contract made by them in their official capacity, or by any body or board of which they are members." The prohibition is directed at the governing board as well as the member having the prohibited interest, so abstention by such member does not remove the prohibition. (76 Ops.Cal.Atty.Gen. 118, 119 (1993); 68 Ops.Cal.Atty.Gen., *supra*, at 351-352.)

If the prospective Yucaipa councilman were employed by a private entity, an agreement with such entity by the city would be prohibited under the general terms of section 1090. (See, e.g., *Fraser-Yamor Agency, Inc.* v. *County of Del Norte* (1977) 68 Cal.App.3d 201, 214-215; *Stockton P. & S. Co.* v. *Wheeler* (1924) 68 Cal.App. 592, 602-603.) Also, it is conceivable that a public officer or employee may have a personal as well as official interest in a public contract. (See *People* v. *Vallerga* (1977) 67 Cal.App.3d 847, 870; 67 Ops.Cal.Atty.Gen., 369, 380-381 (1984).)[4]

Section 1091.5 sets forth what are considered to be "noninterests" for purposes of section 1090. Subdivision (a)(9) of section 1091.5 deals expressly with contracts between two public agencies:

_____

[3]To the extent 68 Ops.Cal.Atty.Gen. 7, *supra*, is inconsistent with our conclusion, it is disapproved.

[4]We assume for purposes of this analysis that the deputy chief would remain in such position regardless of whether the city contracts with the sheriff for law enforcement services.

"(a)  An officer or employee shall not be deemed to be interested in a contract if his or her interest is any of the following:

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"(9)  That of compensation for employment with a governmental agency, other than the governmental agency that employs the officer or employee, provided that the interest is disclosed to the body or board at the time of consideration of the contract, and provided further that the interest is noted in its official record."

The scope of subdivision (a)(9) is not readily apparent.  In analyzing this language, however, we may rely upon well established principles of statutory interpretation.  "When interpreting a statute our primary aim is to determine the Legislature's intent."  (*Freedom Newspapers, Inc.* v. *Orange County Employees Retirement System* (1993) 6 Cal.4th 821, 826.)  "In determining intent, we look to the language of the statute, giving effect to its `plain meaning.'"  (*Kimmel* v. *Goland* (1990) 51 Cal.3d 202, 208-209.)  "`Where uncertainty exists consideration should be given  to the consequences that will flow from a particular interpretation.'"  (*Walnut Creek Manor* v. *Fair Employment & Housing Com.* (1991) 54 Cal.3d 245, 268.)  "Both the legislative history of the statute and the wider historical circumstances of its enactment may be considered in ascertaining the legislative intent."  (*Dyna-Med, Inc.* v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387.)  "`Statements in legislative committee reports concerning the statutory purposes which are in accordance with a reasonable interpretation of the statute will be followed by the courts.'"  (*O'Brien* v. *Dudenhoeffer* (1993) 16 Cal.App.4th 327, 334.)

Here the legislative history of the 1991 amendment of section 1091.5 (Stats. 1991, ch. 382, § 1), which added subdivision (a)(9), is helpful in construing the amendment's language.  In the report of the Assembly Committee on Elections, Reapportionment and Constitutional Amendments dated May 9, 1991, the background information supplied for the proposed legislation was as follows:

"According to the author, government employees who also serve as local elected officials are often prohibited from voting on a broad range of issues, rather than just those bills that affect their employers.  For example, a peace officer who is also an elected official may be prohibited from voting on contracts dealing with any city agency, rather than only those contracts affecting the police department."

This background information was also contained in the report of the Senate Committee on Governmental Organization for its hearing on June 25, 1991, and in the report of the Senate Rules Committee dated July 17, 1991.

Consequently, subdivision (a)(9) of section 1091.5 may be construed as allowing a government employee who serves on the board of another public agency to vote on a contract between the agency and his government employer except when the contract involves his particular employing unit.  Under this interpretation, the prospective councilman here could not participate in the decision to

contract for law enforcement services, since the contract would specifically affect his own employing unit.

As quoted above, the legislative history of the statute's 1991 amendment indicates that a contract between two government agencies may be executed even though a board member of the one is financially interested in the contract by being an employee of the other, as long as he does not participate in the decision.  Normally, this would be possible only when the financial interest is found to constitute a "remote interest" under the terms of section 1091, which provide specific exceptions to the prohibition of section 1090.  Section 1091 states:

"(a) An officer shall not be deemed to be interested in a contract entered into by a body or board of which the officer is a member within the meaning of this article if the officer has only a remote interest in the contract and if the fact of that interest is disclosed to the body of the board of which the officer is a member and noted in its official records, and thereafter the body or board authorizes, approves, or ratifies the contract in good faith by a vote of its membership sufficient for the purpose without counting the vote or votes of the officer or member with the remote interest.

"(b) As used in this article, `remote interest' means any of the following:

"(1) That of an officer or employee of a nonprofit corporation, except as provided in paragraph (8) of subdivision (a) of Section 1091.5.

"(2) That of an employee or agent of the contracting party, if the contracting party has 10 or more other employees and if the officer was an employee or agent of that contracting party for at least three years prior to the officer initially accepting his or her office.

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"(c) This section is not applicable to any officer interested in a contract who influences or attempts to influence another member of the body or board of which he or she is a member to enter into the contract.

"(d) The willful failure of an officer to disclose the fact of his or her interest in a contract pursuant to this section is punishable as provided in Section 1097.  That violation does not void the contract unless the contracting party had knowledge of the fact of the remote interest of the officer at the time the contract was executed."

While section 1091 contains exemptions that might be applicable when two government agencies contract, the two most general exceptions appear to be contained in subdivisions (b)(1) and (b)(2).  The latter, however, first requires three years of employment with the "contracting party," in this case the

sheriff's department.   Subdivision (b)(1) contains no such qualifications,[5] but is a government agency a "nonprofit corporation"?

We may assume that for some purposes, cities (see *Friends of the Library of Monterey Park* v. *City of Monterey Park* (1989) 211 Cal.App.3d 358, 367-369), counties (see *Pitchess* v. *Superior Court* (1969) 2 Cal.App.3d 653, 656), special districts (see *Hewitt* v. *Rincon del Diablo Municipal Water Dist.* (1980) 107 Cal.App.3d 78, 84), and other public agencies (see *Torres* v. *Board of Commissioners* (1979) 89 Cal.App.3d 545, 549-550) may be considered to be corporations not conducted for making a profit.   (See Webster's Third New Internat. Dict. (1971) pp. 510, 1538.)   Such a conclusion here would appear to effectuate the Legislature's intent regarding contracts between two public agencies.   On the other hand, did the Legislature use the term "nonprofit corporation" to cover public agencies in section 1091, when it used much more specific language elsewhere (e.g., § 1091.5, subd. (a)(9)) in referring to government agencies?   The legislative history of the amendment of section 1091 which added the phrase "officer or employee of a nonprofit corporation" (Stats. 1984, ch. 112, § 1) does not contain any indication that the Legislature intended to cover public agencies by such language.   A request for clarification of these ambiguities in the language of sections 1091 and 1091.5 would appear best directed to the Legislature, not the Attorney General.

If the prospective councilman's financial interest in the contract fails the test of being a "remote interest," the council could nonetheless execute the agreement if the "rule of necessity" were applicable.   (See 76 Ops.Cal.Atty.Gen., *supra*, at 121-123.)   In *Eldridge* v. *Sierra View Local Hospital District* (1990) 224 Cal.App.3d 311, 321, the Court of Appeal summarized the rule as follows:

"The rule of necessity provides that a governmental agency may acquire essential goods or services despite a conflict of interest, and in nonprocurement situations it permits a public officer to carry out the essential duties of his/her office despite a conflict of interest where he/she is the only one who may legally act.   The rule ensures that essential government functions are performed even where a conflict of interest exists.   [Citations.]"

As mentioned in *Eldridge*, there are two different situations in which the rule of necessity has been applied.   The first facet of the rule was examined in greater detail in our opinion in 59 Ops.Cal.Atty.Gen. 604 (1976), where we stated:

"We do not attempt to determine all the ramifications of the doctrine of necessity in the case of a contractual transaction.   This office has assumed its existence in extreme cases of emergency, or where no alternative source of supply of goods or services existed.   [Citations.]

"Interestingly, in the above types of situations, the necessity is caused by the need to *obtain* something for the governmental unit, not by the mere fact that only a

---

[5]The exception "in paragraph (8) of subdivision (a) of Section 1091.5" (§ 1091, subd. (b)(1)) allows execution of the contract, with the official in question participating in the decision if certain requirements are met.

particular person or body may act with regard to the transaction."  (*Id.*, at p. 619, fn. 18.)

The lack of an alternative source of required services was examined in 42 Ops.Cal.Atty.Gen. 151, 156 (1963):

> ". . . In a few counties of small population there is only one mortuary and the funeral director is the coroner.  Coroner cases in these counties are handled by the coroner's private mortuary and generally the accompanying funeral business is handled by that mortuary also.  Since the coroner has no real choice about where to have the body held, it is not an abuse of his office to assign the body to his mortuary.  *Cf. Capital Gas Co.* v. *Young*, 109 Cal. 140 (1895) (public utility required to furnish gas to city can collect on bill despite otherwise prohibited interest of mayor); *Hotchkiss* v. *Moran*, 109  Cal.App. 321, 323-324 (1930) (electric company) . . . ."

In 60 Ops.Cal.Atty.Gen., *supra*, 102, we noted that "the `rule of necessity' is to reflect actual necessity after all possible alternatives have been explored."  (*Id.*, at p. 109, fn. 6.)

It is conceivable that this facet of the rule of necessity may be applied in the present circumstances.  Resolution of this issue would require examination of the individual facts to determine whether Yucaipa must "of necessity" contract with the sheriff for law enforcement services, even though cities typically have their own police departments.  A court might apply the rule differently for a contract between two public agencies.

Section 1090 is not the only statute that may affect the renewal of the contract in question.  We also note that the Political Reform Act of 1974 (§§ 81000-91015; "Act") generally prohibits a public official from participating in the making of a governmental decision in which he has a financial interest.  (See 74 Ops.Cal.Atty.Gen., *supra*, at 86; 70 Ops.Cal.Atty.Gen. 45, 46 (1987).)  Potentially applicable here are sections 87100 and 87103.   Section 87100 provides:

> "No public official at any level of state or local government shall make, participate in making or in any way attempt to use his official position to influence a government decision in which he knows or has reason to believe he has a financial interest."

Section 87103 sets forth five possible "financial interests," one of which would appear to be germane to our facts.  Section 87103 provides in part:

> "An official has a financial interest in a decision within the meaning of section 87100 if it is reasonably foreseeable that the decision will have a material financial effect, distinguishable from its effect on the public generally, on the official or a member of his or her immediate family or on:

> ". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"(c)   Any source of income, other than gifts and other than loans by a commercial lending institution in the regular course of business on terms available to the public without regard to official status, aggregating two hundred fifty dollars ($250) or more in value provided to, received by or promised to the public official within 12 months prior to the time when the decision is made."

The facts presented indicate that the prospective councilman's decision regarding the law enforcement agreement would have no effect, direct or indirect, upon his salary from the county. However, even if it conceivably would affect his income, "income" is defined for purposes of the Act as *not* including "salary . . . received from a state, local or federal government agency . . . ."  (§ 82030, subd. (b)(2).)   Hence, for purposes of the Act, the prospective councilman would have no financial interest in the law enforcement agreement based upon his income from the county.[6]

Finally, under general common law principles, public officers are strictly required to avoid placing themselves in positions in which personal interests may come into conflict with their duties to the public.  (*Noble* v. *City of Palo Alto* (1928) 89 Cal.App. 47, 51-52; 74 Ops.Cal.Atty.Gen., *supra*, at 84, fn. 3; 70 Ops.Cal.Atty.Gen., *supra*, at 47.)   California courts have traditionally predicated conflict of interest decisions on the dual basis of statutory restrictions and public policy constraints evolved from the common law.  (46 Ops.Cal.Atty.Gen., *supra*, at 77.)   Even assuming the existence of a disqualifying financial interest, however, all that would be necessary under the common law and applicable statutes (except section 1090) would be for the person to abstain on a transactional basis. (73 Ops.Cal.Atty.Gen., 191, 196 (1990); 70 Ops.Cal.Atty.Gen. 157, 162 (1987).)

It is concluded that the Yucaipa City Council may be able to enter into a contract with the sheriff to provide law enforcement services to the city, even though a councilmember holds the position of San Bernardino County Sheriff's Deputy Chief.

3.   Performance Of Law Enforcement Services

The third inquiry concerns the possible assignment of a sheriff's deputy chief to perform law enforcement duties within a city where he is a city councilman.   Section 1126 provides in part that "a local agency officer or employee shall not engage in any employment, activity, or enterprise for compensation which is inconsistent, incompatible, in conflict with, or inimical to his or her duties as a local agency officer or employee. . . ."

With respect to a person serving as a city councilman, we have previously concluded that section 1126 does not authorize any control over the outside activities of *elected* officials, and thus would not apply to city councilmembers.   (74 Ops.Cal.Atty.Gen., *supra*, at 85, fn. 2; 64 Ops.Cal.Atty.Gen. 795, 800 (1981).)

---

[6]The Fair Political Practices Commission provides advice to local officials concerning the requirements of the Act, and its opinions may be relied upon as a complete defense to civil or criminal penalties assessed under the Act when it has been given all material facts.   (See § 83114; 67 Ops.Cal.Atty.Gen., *supra*, at 374.)

With respect to a person's employment as a sheriff's deputy chief, section 1126 allows a public agency to adopt and enforce an incompatible activities policy covering its employees. Subdivision (b) of section 1126 provides:

"Each appointing power may determine, subject to approval of the local agency, and consistent with the provisions of Section 1128 where applicable, those outside activities which, for employees under its jurisdiction, are inconsistent with, incompatible to, or in conflict with their duties as local agency officers or employees. An employee's outside employment, activity, or enterprise may be prohibited if it: (1) involves the use for private gain or advantage of his or her local agency time, facilities, equipment and supplies; or the badge, uniform, prestige, or influence of his or her local agency office or employment or, (2) involves receipt or acceptance by the officer or employee of any money or other consideration from anyone other than his or her local agency for the performance of an act which the officer or employee, if not performing such act, would be required or expected to render in the regular course or hours of his or her local agency employment or as a part of his or her duties as a local agency officer or employee or, (3) involves the performance of an act in other than his or her capacity as a local agency officer or employee which act may later be subject directly or indirectly to the control, inspection, review, audit, or enforcement of any other officer or employee or the agency by which he or she is employed, or (4) involves the time demands as would render performance of his or her duties as a local agency officer or employee less efficient.

"The local agency may adopt rules governing the application of this section. The rules shall include provision for notice to employees of the determination of prohibited activities, of disciplinary action to be taken against employees for engaging in prohibited activities, and for appeal by employees from such a determination and from its application to an employee. . . ."

Local governments have broad discretion under section 1126 in limiting incompatible activities of their employees. (*Long Beach Police Officers Assn* v. *City of Long Beach* (1988) 46 Cal.3d 736, 748.)[7]

---

[7]The legislative history of the 1991 amendment of section 1091.5, which added subdivision (a)(9), indicates that the genesis for the legislative proposal was a letter to the author of the amendment from a deputy sheriff serving on a city council. The deputy mentioned that the sheriff allowed him to hold office as a councilman but prohibited him from performing any law enforcement duties in the city where elected:

". . . Sheriff's Department guidelines . . . prevent any deputy elected to political office from assignment to a station or project within the political boundaries in which he or she holds office. The Sheriff promulgated this policy to specifically eliminate the appearance of, or opportunity for, a deputy to personally benefit from working as a Sheriff's deputy in the same area in which the deputy is also an elected official."

Such administrative action in eliminating the "incompatibility" aspects of the two positions presents an alternative to prohibiting the holding of a public office by a deputy sheriff.

We have previously indicated that an incompatible activities policy adopted by a local agency[8] under the terms of section 1126 may solve the "difficult legal and practical problem" of applying the office forfeiture remedy of the common law incompatible offices doctrine. In 63 Ops.Cal.Atty.Gen., *supra*, at 719, footnote 6, we observed:

"Section 1126 of the Government Code prohibits local agency officers and employees from engaging in outside activities for compensation which are incompatible with, or in conflict with their duties to their public agency or with the functions of their public agency.

"However, pursuant to subdivision (b) of section 1126 the appointing power, with the concurrence of the local governing body, may define the outside activities which are to be prohibited under the section.

"Section 1126 may provide the solution for a difficult legal and practical problem in local public offices . . . . (*Cf. Neigel* v. *Superior Court* (1977) 72 Cal.App.3d 373.)"[9]

It is concluded that if the Yucaipa City Council contracts with the sheriff for law enforcement services, the sheriff's deputy chief who is a councilman may be assigned to perform law enforcement duties within the city.

\* \* \* \* \*

---

[8]Here the sheriff would be the "appointing power" and the county board of supervisors would be the "local agency" (see § 1125) for purposes of section 1126. (See 77 Ops.Cal.Atty.Gen. 82, 84-89 (1994).)

[9]In our 1980 opinion, we concluded that the incompatible offices doctrine applied to a deputy district attorney. (*Id*., at p. 718.) In response to our conclusion, the Legislature enacted section 1128, allowing public attorneys to hold elective or appointive office. (See 66 Ops.Cal.Atty.Gen. 382, 385-389 (1983).) Legislation would of course be another alternative to the "difficult legal and practical problem" of applying the incompatible offices doctrine in particular situations.